2429.75. Thank you very much. May it please the Court, my name is Jeremy Guttman, I represent Appellant Kent Bulloch. This case involves the provision of the Defense Production Act of 1950 that identifies two circumstances under which, in order to prevent hoarding, no person shall accumulate materials that have been designated as scarce or materials the supply of which would be threatened by such accumulation. We believe that if that one-sentence statute is read in its entirety and its words are read in juxtaposition with one another, the natural reading is that it uses the word accumulate in a manner that is interchangeable with the word hoarding. And that is the way two district court judges that we cite in our papers read it. When they paraphrased what the statute concerns, they substituted hoarding for accumulate. So how long do you have to hold it? You have to hold it long enough to withhold, it needs to be withheld from the market, and particularly, as we read it, under the second clause which Mr. Bulloch was tried under which involves, for purposes of resale above market prices, it would have to be long enough for there to create or take advantage of a rise in the market price. Was it disputed here that the intent and the expectation was to sell these items at a 30 to 60% markup? There was no dispute that there was a markup. A substantial, which you call it a meaningful markup, not a few pennies. No, right. That's true. And that issue is not part of our appeal. Right, but what I'm trying to get at is if that's true, because I think in the conversation that the government has from the undercover, it says, you know, I'm going to add two or three bucks a mask or something. But if that's true, I mean, I remember, I try to block it out, but I remember trying to get a mask and some hand sanitizer in 2020. The prices could go up in three hours or 12 hours or three days. So how do we, doesn't that satisfy, if the purpose is to hold it until you can resell it for, you know, at a price in excess of the prevailing market price, if all he had to do was hold it for a week, isn't that enough? But there was no, here, and I don't think the government will dispute this, there was no contemplation of holding onto it for a second longer than necessary. The facts here, there was a recording where Mr. Bullock, speaking to the undercover, said, I'm not going to acquire these until the money from the purchaser is in my account, and the minute the money, the minute I acquire it, it will be distributed. So there was no, there's not even a second where it's contemplated to hold it so that the price can go up. The price was set before the transaction, before the distribution would take place. So that really doesn't enter into the facts of this case. And I do believe the government agrees that if our interpretation is correct, the conduct involved, or the conspiracy, the agreement, did not involve hoarding in the sense of keeping an inventory of something off the market. So in this case, it's a minute or an hour or a day, and that is not enough in this case. It's not enough because what, again, reading the words naturally and reading all of them together, what's being addressed is hoarding. Right, and it says hoarding. It doesn't say no person shall hoard. It says in order to prevent hoarding, and then they use a new word. Congress elects not to use the same word. That's correct, and we pointed out in our reply brief that they used a different word, you know, out of a notion that I was taught in high school also, that you don't use the same word twice in the same sentence. But couldn't you just say no person shall hoard items, you know, in excess of, why would they use, why would they say accumulate, and why not include, well, you say accumulate, it bakes in the concept of time. Well, right, and they're talking about the kind of accumulation, and if you read, the words at the end of the sentence, that the government ignores and the court below ignored, talk about, or mostly, talk about the kind of withholding that would, it would affect the supply. And we also know from the legislative history, it tells us that the House version of this statute used the word hoard, and it was based on the Lever Act, which the government says we're speculating about the connection. But, in fact, it's in the conference report. We're told they considered that and they used the word hoard. So the final bill affirmatively and proactively removes the word hoard. But the conference report also tells us that the Senate version that was adopted, the language that was adopted, was intended and designed to accomplish the same purpose as the House version. So, clearly, you know, I think our view is we don't need to go to the legislative history, but if we do, it very clearly establishes that the purpose that was meant to be accomplished by the final language was the same as what was meant to be accomplished by the original one, which specifically said, you know, applied to people who hoard necessaries. We're only proceeding under the second provision of the statute? Yes. The market price provision? That was the only provision that was part of the charges here. The government's argument and the way it was approached by the court below is based on a version of statutory interpretation that consists of nothing more than looking at a word in isolation, the word accumulate, and choosing the best or, I believe the district court said, the consensus definition. And that defies the teaching of this court and of the Supreme Court, which repeatedly says in order to interpret the words of a statute, you have to consider them in context and words inform each other. We cited a Latin phrase, which isn't necessary, I don't think, because the court can talk about it without it, but the concept of nositur associates, which, as the Supreme Court tells us, is intended to ensure that courts don't interfere with the legislative prerogative by giving a word a broader meaning than the one that the legislature intended. I do see my time is up, but I'll reserve it. Thank you, Your Honors. Attorney Pollack. Good morning. May it please the Court. I am Robert Pollack, and I represent the United States in this appeal. I also represented the United States in the district court below. The evidence at trial proves beyond a reasonable doubt that the defendant conspired to accumulate millions of PPE masks, as many as he could accumulate, as many as he could get money to secure, specifically for the purpose of reselling them at prices in excess of the prevailing market prices. That is conduct at the core of the plain text of the statutory prohibition, and the fact that his conduct was at the core of the statutory prohibition is further established by the abundant evidence at trial reflecting consciousness of guilt. So, I mean, you're sort of arguing the conclusion, right? Whether that's at the core of the statute is exactly the question before us. And so one of the things I'm trying to sort through is clearly the statute and the history and everything surrounding it evinces an interest in making sure that products get to the market, that they're not kept out of circulation at a time when they're most needed. There's the second piece that the government ascribes to the statute based on that provision, which is to criminalize profiteering, right? Price gouging is the term the brief uses, but I think profiteering is sort of the old-time term for that. And when I look at the legislative history, it does express a concern about profiteering, but it addresses them in the context of the separate section of the Defense Production Act dealing with wage and price controls. And in the section that we're dealing with here, the statute specifically says, no provision of this chapter shall be interpreted as providing for the imposition of wage or price controls without the prior authorization of Congress and all the processes that go into wage and price controls. If we're regulating profiteering, why isn't that a price control? Well, I don't think that the prohibition is a prohibition on profiteering as such. It's not a sort of a moral condemnation of profiteering. It is concerned with securing the supply of scarce materials. The prefatory clause, which says in order to prevent hoarding, that declares a purpose for that provision of the statute, and both provisions do prevent hoarding, not only by a defendant who's charged here, but by everybody in the marketplace. So essentially the statute prohibits two different things, two forms of accumulation. Accumulation too much, accumulation in excess of the reasonable need, and the second one, accumulation for the purpose of what you could call price gouging or something like that. Accumulation for the purpose of reselling in excess of prevailing market prices. If people in the marketplace are doing those two things, both of those two things have an inflationary price effect. They both push prices up throughout the marketplace, and that encourages everybody to hoard, even people whose conduct is not directly contemplated by the statute, people, for instance, who have a preexisting supply of scarce materials. If they see prices shooting up because there are other hoarders and price gougers in the marketplace, that encourages them, out of insecurity of their future supply, to hoard what they've already got, to not let it out into the marketplace. So by creating a criminal prohibition, both against accumulating too much and accumulating for an improper purpose, that discourages hoarding all throughout the marketplace, not merely by the defendant. So to the extent that the statute's concerned about price gouging, am I right in understanding that it criminalizes the accumulation with an intent, acquiring it with an intent, but somebody who already has a warehouse full of masks can price gouge to their heart's content, and that doesn't fall within the scope of the statute? That's right. And is that an incongruous way of understanding the statutory scheme? No, I think that's consistent with the view that I just described, where the purpose of the statute is not to sort of condemn profiteering in some generic sense, but to keep goods moving onto the marketplace. So if somebody has a preexisting warehouse full of scarce materials, the fact that they can charge whatever as much as they can, they can charge anything without violating the statute, that encourages them to do that. The thing that the criminal prohibition is preventing is someone from creating a new accumulation that they wouldn't otherwise have been accumulating for that illicit purpose. So a person, a sort of new participant in the marketplace, cannot accumulate the scarce materials more than is actually necessary for them or accumulate them specifically for the purpose of going out and charging super competitive prices. So how would you then distinguish the conduct? I mean, clearly shortages are going to drive up prices. Right. And that's the natural, I mean, this is, the statute in its own way is trying to respond to that natural capitalistic sort of fact. Is there any, I'm just trying to figure out, so business person who buys things and sells things, that's what they do. Any person who intends to sell for more than just a little bit, more than what they bought it for is now, once it's been declared a scarce resource under the statute, can't do that. Is that right? So, I mean, there's a, I feel like there's a tricky factual question buried in that question about what the prevailing market price is. The statute does not lock in market prices. And there is, in fact, at trial, there was an expert witness who was both an M.D. and a Ph.D. in economics who was qualified as an expert in medical economics specifically who testified using data on PPE masks from the biggest hospital chain in New York City about the sort of market effects at that time. Right. And he said 50 cents to a dollar. Is that right? That's correct. And our defendant here bought them for 380. So weren't they already way up the price? So he was buying them. He was trying to buy them. He was trying to get money in order to buy them in California from suppliers overseas, contemplating that he would then load them into a box truck and drive them to New York and sell them in New York. So it may be that he was already buying them at super competitive prices because he wasn't really a participant in this market previously. He was trying to insert himself as a middleman, getting them at whatever price he could in order to come and sell them in New York City. But in any case, the statute doesn't – there's no requirement in the statute that he have an intent to withhold them, only that he had intent to sell them at an excess of the prevailing market price. Right. I'm just trying to figure out an importer, all right, like somebody who buys – imports stuff and sells it. I'm trying to understand in a scarce market like this what the – how they know when what they're doing is okay versus not. And so we've got this sort of general language that you can't acquire for the purpose of sailing above prevailing rates, but if the price is – some would say that the prevailing rates are what a willing buyer is willing to pay, a willing seller, right? So in that sense, anybody's – In that sense, the statute wouldn't be able to do anything because whatever – there would be no such thing as a super competitive price in that case. Right. So that's clearly not what the statute means. There must – prevailing prices means something other than what a willing buyer would pay a willing seller. And so there's some line there that the person who imports the masks and then is going to turn around and resell them, there's some amount of markup that is permissible under the statute and some amount that's over the top. I think that's – I think that is essentially correct. There's a – I think, again, there's getting to this thorny factual question of what is the market rate, which is why there is expert testimony. Your Honor quoted the sort of top line expert testimony, but the sort of the analysis that the expert did there was to explain in sort of more granular detail the sort of pricing dynamics that were happening. There were preexisting participants in those markets, buyers and sellers. They continued doing what they always did. The prices did go up because of the realities of the market. None of those people were in danger of violating the statute. They were just doing what they always did. So if it's a new market entrant who doesn't have a track record of buying and selling with particular customers, that might be a factor that creates a greater risk of violation? I don't think that – I certainly don't think that's this positive. But I think when – and, in fact, there could be new market entrants, for instance, you know, factories that are switching their machining over to start producing the scarce materials instead of something else, and the law would encourage that. They're not trying to accumulate things too much and they're not trying to accumulate anything in order to sell it at a super competitive rate. They're just increasing the overall supply. What I'm trying to figure out – and this is the struggle, right? It's a criminal statute. Right. And so it's got to give people fair notice of what they can and can't do. And I understand what you're saying. This is a thorny factual question. But – so I guess what we're saying is the legitimate business person who's buying and wants to sell at a profit is essentially taking the risk that post hoc experts are going to look at that price and say, no, that's beyond the prevailing rate. Or what do they look at in real time to tell them it's okay? Well, you know, I mean, in real time, I think it's hard to answer that question and sort of with an abstract business person. The facts in this case, obviously, there's someone who is clearly contemplating that what he's doing is running afoul of the law. He's making jokes about his pinkish skin not looking good in orange. Right. Creating falsified documents. So does that matter? Like if he had actually thought he was not doing anything wrong, that he's a business person, he's trying to get stuff to the market, maybe even get it to the highest value user by charging more money, and, you know, economic theory, does that make a difference? I think there could be a factual defense. And, in fact, the factual defense at trial was really that the defendant did not conspire to accumulate anything. He was sort of acting more like a broker and just trying to get things out as quickly as they could. And the jury rejected that argument. Well, they rejected that argument because they were instructed that it didn't matter if that was the intent, if the intent was to mark it up. And so now I'm trying to figure out how much of a markup. Well, there was really not really an issue at trial about there was no defense case about what prevailing market price was. We proved the prevailing market price using expert testimony. That was essentially uncontested. The issue at trial, the question really that went to the jury, was whether the defendant conspired to accumulate materials for the purpose of selling it super competitive. I don't know that there was ever a stipulation that he intended to sell them at above market prices, but that wasn't really contested. The defense at trial was he was essentially a broker. He did not conspire to accumulate anything. That's a factual defense. And the jury rejected that. The reason... Wait a minute. A factual defense is dependent on a different jury instruction, right? If your theory is right, then, as to what the law is, then saying I'm a broker but just intended to be a middle person, I wasn't even going to withhold these from the market, right, that's not a defense under your review of the law. I think it could be a defense because the issue in the jury instruction wasn't on the prevailing market price, which was uncontested. The issue in the jury instruction was the definition of accumulate. The jury was instructed that accumulate just means what it ordinarily means, gather, collect, or accrue.   Right, exactly. The defense wanted to instruct the jury that, no, in this statute, accumulate specifically means hoard with an intent to withhold from the marketplace. He didn't get that instruction because that's not what the statute says. But he still argued to the jury that there was no conspiracy to accumulate because the purpose was to just move these onto the market as quickly as possible. And under the sort of standard dictionary definition, accumulate means acquire, collect, accrue. So you would locate the concern I'm probing here, you would locate that in the prevailing price box, which wasn't really litigated. That's right. The question of what the prevailing price is is a complicated, fact-specific thing. As Judge Merriam pointed out, that could be changing hour to hour, day to day. That wasn't really contested here, maybe because the price markup was so great. The issue at trial was just whether this conduct is sufficient to show a conspiracy to accumulate with that illicit purpose. And the jury found that it did based on the common sense definition. Excuse me, I'm out of time. I have a follow-up. So you have sort of a backup argument here, which is, and I want to point this out, the charge actually given doesn't use acquire, which is why I kept using my alternative when I was thinking through this, is if accumulate is over time, acquire is in one moment. But the charge actually doesn't use acquire, which I think is almost certainly a moment in time. It uses gather, collect, or accrue. And you have this argument that's sort of secondary. It says, by the way, all of those have similar, to the extent there's a temporal aspect implied in accumulate, it is similarly sort of available to the jury in those words, gather, collect, accrue. Can you just... That's exactly right. Obviously, accumulate sometimes has a temporal connotation. It's a verb that occurs in time. The other words, the sort of synonyms or approximate synonyms that come right out of popular dictionaries that were used in the jury instruction all have that same time element. As Judge Committee said when he affirmed the judgment on the first appeal to the district court, accumulation can occur over a long period of time or a short period of time. No particular period adheres in the word itself. And that's really the whole issue on appeal, is that word accumulate. I note that none of you cited the Merriam-Webster dictionary. So I was a little offended that I got left out. I cited, too, Merriam-Webster. Second answer. Merriam-Webster, second issue, new jurisdiction. Thank you, Judge. Thank you. Attorney General. Part of the reason that the meaning of prevailing market price under the government's definition is so slippery is because it is divorced from what we believe is the real subject matter of this statute. And I think the legislative history is helpful on this point also because we also cited Senator Capehart, who was a member of the Banking Committee, and in testimony very shortly after the passage of this, he said the reason we put this provision in was to get after that there were inventories. This was at the time of the Korean War, and steel was in short supply. There are inventories sitting in warehouses, and people are holding them for black market prices. And if you understand that when they say accumulate they mean hoarding, because that's what the focus of this legislation is, then there is a manageable way to define what you mean by above-prevailing market prices because you're talking about a price that will increase from the time that you start hoarding to the time that you then put it on the market again. So there would be something to measure by. I mean, we had a... Well, isn't that, I mean, that could take, in a market like this, that could happen instantaneously, as my colleague said, right? I mean, the fact that he's able to sell them for significantly more than he bought them for suggests that he doesn't have to hold them very long to sell them at higher prices. Well, that may be. But, you know, again, the testimony we cite is pointing to the fact that what Congress was addressing was people holding, you know, businesses holding inventories. The speech by President Truman that led to this talked about, you know, that there shouldn't be unnecessary inventories. Things should get out. And, you know, that's what this hearing testimony talks about. And if it's understood that way, then it's clear what we mean by the prevailing market price. I mean, at our trial, the testimony about the prevailing market price wasn't exactly apt because it was large hospital corporations dealing with masks. And the truth is, in 2020, you know, it was a market that had never existed before. And the market wasn't even hospitals. It was people who needed masks to go to work and to send their kids to school. So, you know, it was a whole different world. But getting back again to the plain meaning of the statute, it does use the word accumulate. It doesn't use acquire. It doesn't use collect. And read in context, it comes after the words in order to prevent hoarding. And it comes before a provision that says we're talking about supplies, about materials, the supply of which would be affected by such accumulation. And I think if you read that last part, the effect on a supply doesn't happen from acquiring a mask and immediately putting it in the market. The effect on supply happens if you hold on to something. And I guess I also wanted to comment that the government offered sort of an elaborate economic theory about how increasing the price is going to encourage more people to hoard or, you know, will encourage people to hoard. I'm not sure that that's correct because I think logically I think if the prices are going up, people will be encouraged to take advantage of those prices and not hoard and sell whatever they have. But whether it is or it isn't, this is all latter-day, you know, philosophizing about what may be the economic effect was. There's nothing in the statute that addresses that, and there's nothing in the statute that addresses that.